UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

    v.                            CASE NO. 8:17-cr-302-T-02CPT

CHARLES RUGGIERO

## UNITED STATES' RESPONSE IN OPPOSITION TO CHARLES RUGGIERO'S MOTION FOR COMPASSIONATE RELEASE

The United States opposes Charles Ruggiero's motion for compassionate release and/or home confinement pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) based on COVID-19 concerns. Doc. 73. Ruggiero has not exhausted his administrative remedies nor has he demonstrated that he has any medical conditions that satisfy the requirements for compassionate release. And, in any event, the Bureau of Prisons ("BOP") has implemented a COVID-19 action plan to minimize the risk of transmission into and throughout its facilities.[1]  Accordingly, COVID-19 is not an extraordinary and compelling reason to grant Ruggiero compassionate release.

---

[1] *See* Updates to BOP Covid-19 Action Plan, available at https://www.bop.gov/resources/news/20200319_covid19_update.jsp (last updated June 22, 2020).

## I.   Background.

This Court sentenced Ruggiero to 60 months' imprisonment after pleading guilty to access with intent to view child pornography, in violation of 18 U.S.C. §§ 2252(a)(4)(b) and (b)(2). Doc. 61. Ruggiero is currently incarcerated at FCI Jessup in Jessup, Georgia, is 39 years old, and is projected to be released on December 5, 2021. *See* BOP Inmate Locator at https://www.bop.gov/inmateloc/ (last accessed on June 22, 2020). On June 8, 2020, Ruggiero filed the instant motion for compassionate release based on the unsupported speculation that a COVID-19 outbreak could occur at the facility where he is housed. Doc 73.

The United States is cognizant of inmate concerns stemming from COVID-19. The United States, nor the BOP, minimize the concern or risk; this unique situation is being diligently monitored. The BOP has taken aggressive action to mitigate the effects of COVID-19, and has been taking proactive steps to prevent potential coronavirus transmissions for months. As detailed below, the United States opposes Ruggiero's requested relief.

## II.   The BOP's response to COVID-19.

COVID-19 is a dangerous illness that, in a short time, has caused many deaths in the United States and a massive disruption to our society and economy. In response to the pandemic, the BOP has taken significant measures to protect the health of the inmates in its charge. To aid this Court in

its consideration of Ruggiero's motion, a summary of the BOP's response to COVID-19 follows.

The BOP has explained that "maintaining safety and security of [BOP] institutions is [BOP's] highest priority." BOP, Updates to BOP COVID-19 Action Plan: Inmate Movement (Mar. 19, 2020), available at https://www.bop.gov/resources/news/20200319_covid19_update.jsp.

Indeed, BOP has had a Pandemic Influenza Plan in place since 2012. *See* BOP Health Services Division, Pandemic Influenza Plan-Module 1: Surveillance and Infection Control (Oct. 2012), available at https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf. That protocol is lengthy and detailed. It establishes a six-phase framework requiring BOP facilities to begin preparations when there is first a "[s]uspected human outbreak overseas." *Id*. at i. The plan addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates.

Consistent with that plan, the BOP began planning for potential coronavirus transmissions in January 2020 by establishing a working group to develop policies in consultation with subject matter experts in the Centers for Disease Control, including by reviewing guidance from the World Health Organization.

3

On March 13, 2020, BOP began to modify its operations, in accordance with its Coronavirus (COVID-19) Action Plan ("Action Plan"), to minimize the risk of COVID-19 transmission into and inside its facilities. Since that time, as events require, BOP has repeatedly revised the Action Plan to address the crisis.

Beginning April 1, 2020, BOP implemented Phase Five of the Action Plan, which currently governs operations. The current modified operations plan requires that all inmates in every BOP institution be secured in their assigned cells/quarters for a period of at least 14 days, in order to stop any spread of the disease. Only limited group gathering is afforded, with attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. Further, BOP has severely limited the movement of inmates and detainees among its facilities. Though there will be exceptions for medical treatment and similar exigencies, this step as well will limit transmissions of the disease. Likewise, all official staff travel has been canceled, as has most staff training.

All staff and inmates have been and will continue to be issued face masks and strongly encouraged to wear an appropriate face covering when in public areas when social distancing cannot be achieved.

Every newly admitted inmate is screened for COVID-19 exposure risk factors and symptoms. Asymptomatic inmates with risk of exposure are

4

placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. In addition, in areas with sustained community transmission, such as Philadelphia, all facility staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with a stuffy or runny nose can be placed on leave by a medical officer.

Contractor access to BOP facilities is restricted to only those performing essential services (e.g., medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems. All volunteer visits are suspended absent authorization by the Deputy Director of the BOP. Any contractor or volunteer who requires access will be screened for symptoms and risk factors.

Social and legal visits were stopped as of March 13, and remain suspended until at least May 18, 2020, to limit the number of people entering the facility and interacting with inmates. In order to ensure that familial relationships are maintained throughout this disruption, BOP has increased inmates' telephone allowance to 500 minutes per month. Tours of facilities are also suspended. Legal visits are permitted on a case-by-case basis after the

attorney has been screened for infection in accordance with the screening protocols for prison staff.

Further details and updates of BOP's modified operations are available to the public on the BOP website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp.

### III.   As part of its response to COVID-19, the BOP may designate certain inmates to a term of home confinement.

In an effort to relieve the strain on BOP facilities and assist inmates who are most vulnerable to the disease and pose the least threat to the community, the BOP is exercising greater authority to designate inmates for home confinement. On March 26, 2020, the Attorney General directed the Director of the Bureau of Prisons, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement. That authority includes the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, *see* 18 U.S.C. § 3624(c)(2), and to move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g).

Congress has also acted to enhance the BOP's flexibility to respond to the pandemic. Under the CARES Act, enacted on March 27, 2020, the BOP may "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" if the Attorney General

finds that emergency conditions will materially affect the functioning of BOP. Pub. L. No. 116-136, § 12003(b)(2). On April 3, 2020, the Attorney General gave the BOP Director the authority to exercise this discretion, beginning at the facilities that so far have seen the greatest incidence of coronavirus transmission. *See* April 3, 2020 Memorandum to Director of Bureau of Prisons.[2]

Taken together, all of these measures are designed to mitigate sharply the risks of COVID-19 transmission in BOP institutions. The BOP has pledged to continue monitoring the pandemic and to adjust its practices as necessary to maintain the safety of prison staff and inmates while also fulfilling incarceration orders.

Unfortunately and inevitably, some inmates have become ill, and more likely will in the weeks ahead. But the BOP must consider its concern for the health of its inmates and staff alongside other critical considerations. For example, notwithstanding the current pandemic crisis, the BOP must carry out its charge to incarcerate sentenced criminals to protect the public. It must consider the effect of a mass release on the safety and health of both the

---

[2] BOP has described its increased use of home confinement on its website: https://www.bop.gov/resources/news/20200405_COVID19_home_confinement.jsp. 17. Inmates do not need to apply to be considered for home confinement. BOP Case Management staff are urgently reviewing all inmates to determine which ones meet the criteria established by the Attorney General.   While all inmates are being reviewed for suitability for home confinement, any inmate who believes he or she is eligible may request to be referred to home confinement and provide a release plan to his or her Case Manager.

inmate population and the citizenry. It must marshal its resources to care for inmates in the most efficient and beneficial manner possible. It must assess release plans, which are essential to ensure that a defendant has a safe place to live and access to health care in these difficult times. And it must consider myriad other factors, including the availability of both transportation for inmates (at a time that interstate transportation services often used by released inmates are providing reduced service), and supervision of inmates once released (at a time that the Probation Office has necessarily cut back on home visits and supervision).

**IV.    The legal framework of Ruggiero's home-detention request.**

Ruggiero has asked that this Court order BOP to place him on home confinement. That request must be denied because this Court has no authority to direct the BOP to place a defendant in home confinement. Rather, such designation decisions are committed solely to the BOP's discretion. *See United States v. Calderon*, No. 19-11445, 2020 WL 883084, at *1 (11th Cir. Feb. 24, 2020) (district courts lack jurisdiction to grant early release to home confinement pursuant to Second Chance Act, 34 U.S.C. § 60541(g)(1)(A)).

Once a court imposes a sentence, the BOP is solely responsible for determining an inmate's place of incarceration to serve that sentence. *See* 18 U.S.C. § 3621(b); *Moore v. United States Att'y Gen.*, 473 F.2d 1375, 1376 (5th Cir.

1973) (per curiam)[3]; *see also McKune v. Lile*, 536 U.S. 24, 39 (2002) (plurality opinion) ("It is well settled that the decision where to house inmates is at the core of prison administrators' expertise."). A court has no authority to designate a prisoner's place of incarceration. *Tapia v. United States*, 564 U.S. 319, 331 (2011) ("[a] sentencing court can recommend that the BOP place an offender in a particular facility or program ... [b]ut decision making authority rests with the BOP."); 18 U.S.C. § 3621(b) ("The Bureau of Prisons shall designate the place of the prisoner's imprisonment[.]"). Because Ruggiero's request for home confinement alters only the place of incarceration, not the actual term of incarceration, only the BOP may consider his request.

Moreover, neither the Constitution nor statute allows the Court to order home confinement. A prisoner has no constitutional right to confinement in any particular place, including in home confinement. *See Sandin v. Conner*, 515 U.S. 472, 478 (1995) ("the Due Process Clause did not itself create a liberty interest in prisoners to be free from intrastate prison transfers."); *Meachum v. Fano*, 427 U.S. 215, 224 (1976) ("The conviction has sufficiently extinguished the defendant's liberty interest to empower the State to confine him in *any* of its prisons."). Following the imposition of sentence, courts have limited jurisdiction to correct or modify that sentence absent specific circumstances

---

[3] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent the decisions of the former Fifth Circuit rendered prior to the close of business on September 30, 1981.

enumerated by Congress in 18 U.S.C. § 3582. *United States v. Diaz-Clark*, 292
F.3d 1310, 1319 (11th Cir. 2002). Section 3582(c) contemplates only a
reduction in sentence. *See* § 3582(c). But Ruggiero's request to serve the rest of
his term in home confinement, as opposed to prison, works no reduction to his
sentence. Home confinement merely permits the inmate to serve out his term
of imprisonment at home. Ruggiero's request for such relief therefore falls
outside § 3582(c)'s limited grant of authority to this Court to modify a
sentence post-conviction. Because section 3582(c) deprives this Court of
jurisdiction to grant home confinement and because Ruggiero offers no other
statutory authority to support his request for such relief, this Court has no
authority to act on his request for home confinement.[4]

## V.     The legal framework of Ruggiero's compassionate release request.

A court may reduce a term of imprisonment upon finding
"extraordinary and compelling circumstances," consistent with applicable
policy statements of the Sentencing Commission. 18 U.S.C. § 3582(c)(1)(A).
Under the statute, as amended by Section 603(b) of the First Step Act, the
Court may act "upon motion of the Director of the Bureau of Prisons, or upon

---

[4] If a court grants a sentence reduction, it may "impose a term of … supervised
release with or without conditions that does not exceed the unserved portion of the original
term of imprisonment." 18 U.S.C. § 3582(c)(1)(A). In imposing a term of supervised release,
the court may impose a period of home confinement as a condition of supervised release,
provided that the court finds that home confinement is a "substitute for imprisonment."
USSG §5F1.2; *see* 18 U.S.C. § 3583(d). Alternatively, a court may consider modifying an
existing term of supervised release to add a period of home confinement, consistent with
USSG §5F1.2. *See* section 3583(e)(2).

motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier."

Examples of qualifying "extraordinary and compelling reasons" include (1) terminal illness; (2) a serious medical condition that substantially diminishes the ability of the defendant to provide self-care in prison; or (3) the death of the caregiver of the defendant's minor children. *See* USSG §1B1.13 comment. (n.1). Even when an extraordinary and compelling reason exists, however, a court should only grant a motion for release if it determines that the defendant is not a danger to the public. USSG §1B1.13(2). And the court must consider, in general, whether the 18 U.S.C. § 3553(a) factors weigh in favor of release. *See* 18 U.S.C. § 3582(c)(1)(A); USSG §1B1.13.

Previously, only the BOP could file a motion for compassionate release. The First Step Act amended the provision to allow defendants to file such a motion as well. *See* First Step Act of 2018, 115 P.L. 391, § 603(b)(1). Before a defendant may file a motion, however, the defendant must have either (a) "fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf," or (b) 30 days must have lapsed since the receipt of such a request by the warden of the prison. 18 U.S.C. § 3582(c)(1)(A). The failure to have exhausted administrative remedies within

the BOP is fatal to a defendant's motion for compassionate release. *United States v. Raia*, No. 20-1033, 2020 WL 1647922, at *2 (3rd Cir. Apr. 2, 2020) (published) (per curiam) ("Given BOP's shared desire for a safe and healthy prison environment, we conclude that strict compliance with § 3582(c)(1)(A)'s exhaustion requirement takes on added—and critical—importance."); *see also United States v. Estrada Elias*, No. 6: 06-096-DCR, 2019 WL 2193856, at *2 (E.D. Ky. May 21, 2019); *accord United States v. Elgin*, Case No. 2:14-cr-129-JVB-JEM, 2019 U.S. Dist. LEXIS 86571, *2–3 (N.D. Ind. May 23, 2019); *cf. United States v. Leverette*, 721 F. App'x 916, 917 (11th Cir. 2018) (exhaustion of BOP remedies is requisite for judicial review under 28 U.S.C. § 2241); *United States v. Roberson*, 746 F. App'x 883, 885 (11th Cir. 2018) (same); *United States v. Alexander*, 609 F.3d 1250, 1260 (11th Cir. 2010) (same).

An inmate may appeal the Warden's compassionate-release denial through BOP's administrative remedies program. 28 C.F.R § 571.63(a). Here, Ruggiero has failed to exhaust his administrative remedies. The attached BOP records reflect that Ruggiero filed for compassionate release on May 2, 2020, which the Warden timely denied on May 15, 2020. *See* Exhibits A (Request for Compassionate Release), B (Warden's Denial). On May 19, 2020, Ruggiero submitted a request for an administrative remedy, which was denied on May 29, 2020. *See* Exhibit C (Administrative Remedy Log). In its response, the Warden provided the rationale in support of a denial of Ruggiero's request

for an administrative remedy. *See* Exhibit D. The Warden explained that Ruggiero is not eligible for compassionate release or a reduction in sentence based on COVID-19 because Ruggiero does not meet the age requirements and has a conviction for a sex offense that makes him ineligible. *Id*. The Warden also advised Ruggiero that he could appeal the decision. *Id.*

Ruggiero, has not administratively appealed the Warden's denial. This Court should not entertain Ruggiero's motion for compassionate release absent that appeal (or after 30-day lapse from such an appeal). *Elgin*, 2019 U.S. Dist. LEXIS 86571, at *3. Only a denial at the level of either the BOP's director or general counsel constitutes a "final administrative decision" that may not be further appealed within the administrative remedies program, 28 C.F.R. § 571.63(b), (d). Therefore, absent a final administrative decision, an inmate has failed to exhaust his administrative remedies as required by 18 U.S.C. § 3582(c)(1)(A). Ruggiero has not met either his exhaustion or delay requirement.

## VI.   Ruggiero has not identified extraordinary and compelling reasons for compassionate release.

In any event, Ruggiero's request for a sentence reduction should be denied because he has not demonstrated "extraordinary and compelling reasons" warranting release. As explained above, under the relevant provision of section 3582(c), a court can grant a sentence reduction only if it determines that "extraordinary and compelling reasons" justify the reduction and that

"such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i). The Sentencing Commission's policy statement defines "extraordinary and compelling reasons" to include, as relevant here, certain specified categories of medical conditions. USSG § 1B1.13, cmt. n.1(A). Potential COVID-19 exposure is not an extraordinary and compelling reason to grant release under any circumstances.

To state a cognizable basis for a sentence reduction based on a medical condition, a defendant first must establish that a condition that falls within one of the categories listed in the policy statement. Those categories include, as particularly relevant here, (i) any terminal illness, and (ii) any "serious physical or medical condition … that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." USSG §1B1.13, cmt. n.1(A). If a defendant's medical condition does not fall within one of the categories specified in the application note (and no other part of the application note applies), the motion must be denied.

The mere existence of the COVID-19 pandemic—which poses a general threat to every non-immune person in the country—does not fall into either of those categories and therefore could not alone provide a basis for a sentence reduction. The categories encompass specific serious medical conditions

afflicting an individual inmate, not generalized threats to the entire

population. As the Third Circuit has held, "the mere existence of COVID-19

in society and the possibility that it may spread to a particular prison alone

cannot independently justify compassionate release." *Raia*, 2020 WL 1647922

at *2; *see also United States v. Gileno*, No. 3:19-cr-161-(VAB)-1, 2020 WL

1307108, at *4 (D. Conn. Mar. 19, 2020) (denying compassionate release

because BOP's proposed plan adequately addresses the COVID-19

pandemic).[5]  To classify COVID-19 as an extraordinary and compelling

reason would not only be inconsistent with the text of the statute and the

policy statement, but would be detrimental to the BOP's organized and

comprehensive anti- COVID-19 regimens, could result in the scattershot

treatment of inmates, and would undercut the strict criteria BOP employs to

determine individual inmates' eligibility for sentence reductions and home

confinement. Section 3582(c)(1)(A) contemplates sentence reductions for

specific individuals, not the widespread prophylactic release of inmates and

---

[5]  *See also, e.g., United States v. Coles*, 2020 WL 1899562 (E.D. Mich. Apr. 17, 2020)
(denied for 28-year-old inmate at institution with outbreak); *United States v. Okpala*, 2020 WL
1864889 (E.D.N.Y. Apr. 14, 2020); *United States v. Weeks*, 2020 WL 1862634 (S.D.N.Y. Apr.
14, 2020); *United States v. Haney*, 2020 WL 1821988 (S.D.N.Y. Apr. 13, 2020) (denied for 61-
year-old with no other conditions); *United States v. Pinto-Thomaz*, 2020 WL 1845875
(S.D.N.Y. Apr. 13, 2020) (two insider trading defendants with less than a year to serve have
no risk factors); *United States v. Korn*, 2020 WL 1808213, at *6 (W.D.N.Y. Apr. 9, 2020) ("in
this Court's view, the mere *possibility* of contracting a communicable disease such as
COVID-19, without any showing that the Bureau of Prisons will not or cannot guard against
or treat such a disease, does not constitute an extraordinary or compelling reason for a
sentence reduction under the statutory scheme."); *United States v. Carver*, 2020 WL 1892340
(E.D. Wash. Apr. 8, 2020).

the modification of lawfully imposed sentences to deal with a world-wide viral pandemic.

Courts have generally recognized that "it is a rare case in which health conditions present an 'exceptional reason'" to allow for release where detention otherwise would be warranted. *United States v. Wages*, 271 Fed. App'x 726, 728 (10th Cir. 2008) (considering pretrial detention). A defendant seeking compassionate release bears the burden of establishing that release is warranted. *United States v. Heromin*, 8:11-cr-550-T-33SPF, 2019 WL 2411311, at *2 (M.D. Fla. June 7, 2019) (J. Covington); *cf. United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013) (holding that a movant for a reduction under section 3582(c)(2) bears the burden to establish a reduction is warranted). Here, Ruggiero simply has not met his burden.

In his original request to the Warden, Ruggiero has asserted that he suffers from a "chronic sinus infection that creates excessive debris in [his] lungs," which presumably makes him more vulnerable to becoming seriously ill should he contract COVID-19. For two separate reasons, that contention does not establish "extraordinary and compelling reasons" for a sentence reduction under § 3582(c)(1)(A) and so Ruggiero's motion cannot be granted.

First, Ruggiero has not provided sufficient documentation for his asserted medical conditions and therefore cannot meet his burden to establish his entitlement to a sentence reduction on that ground alone. Ruggiero simply

asserted that he has a medical condition in his initial request to the Warden but failed to include any documentation to support his claim. *See* Exhibit A. And, he failed to raise his alleged health condition as a concern in his motion. Doc. 73.

Second, Ruggiero has not identified a medical condition that falls within one of the categories specified in the policy statement's application note. Ruggiero's asserted condition does not itself rise to the level of severity required under the policy statement. A chronic sinus infection is not a terminal illness, and Ruggiero has not provided any documentation that his sinus infection diagnosis is a "serious medical condition that substantially diminishes the ability of [Ruggiero] to provide self-care in prison." *See* USSG §1B1.13 comment (n.1). Further, Ruggiero's condition is not one of the conditions identified by the CDC as increasing a person's risk for developing serious illness from COVID-19.

The United States has contacted FCI Jessup that houses Ruggiero. No cases of COVID-19 have been reported at Ruggiero's facility.

Finally, even if a case of COVID-19 were to be confirmed at the facility, the facility has the capacity to address it. The facility employs a team of medical professionals and provides round-the-clock medical care. The facility is equipped to provide medical isolation when required. By virtue of being in the BOP's custody, Ruggiero is in the presence of medical professionals at all

times. In the unlikely event that Ruggiero becomes infected with COVID-19, he will be quarantined, monitored, and receive necessary medical treatment, wholly consistent with the CDC's guidelines. Ruggiero has not made a factual record that his needs will not be met while detained.

**VII.** **Even if Ruggiero could establish an extraordinary and compelling reason for compassionate release, the applicable section 3553(a) factors strongly weigh against granting him compassionate release.**

Furthermore, setting COVID-19 concerns aside, this Court must deny release unless it determines the defendant "is not a danger to the safety of any other person or to the community." USSG §1B1.13(2). Additionally, this Court must consider the section 3553(a) factors, as "applicable," as part of its analysis. *See* section 3582(c)(1)(A); *United States v. Chambliss*, 948 F.3d 691, 694 (5th Cir. 2020). Ruggiero has not met his burden of establishing eligibility, and the section 3553(a) factors strongly weigh against granting compassionate release.

In 2009, Ruggiero pleaded guilty to transportation of child pornography and was sentenced to 72 months in federal prison. Doc. 29, ¶ 45. While on supervised release, Ruggiero violated the terms of his supervision by committing the offense in this case (access with intent to view child pornography). *Id.* BOP guidance dictates that an inmate's risk level of recidivism must be at a minimum in order to be considered for home confinement. *See* Exhibit D. Ruggiero's risk of recidivism is medium, which

makes him ineligible for home confinement. *Id*. BOP has concluded that home confinement is inappropriate in this case, which reflects BOP's expert judgment that it is not in the public interest to release Ruggiero at this time in light of his record and individual circumstances.

In sum, this Court should deny Ruggiero's motion for compassionate release based on his failure to exhaust administrative remedies. And, if this Court were to consider the merits of Ruggiero's motion, it fails there, too. First, Ruggiero has not established that "extraordinary and compelling reasons" support a sentence reduction; second, Ruggiero has not met his burden to show that a reduction is warranted in light of the relevant section 3553(a) factors.

Lastly, Ruggiero's premature release would infringe on his victim's right to reasonable protection provided under the Crime Victims' Rights Act, which specifies that crime victims have "[t]he right to be reasonably protected from the accused." 18 U.S.C. § 3771(a)(1). The CVRA requires that the Court "ensure that the crime victim is afforded the rights" contained therein, which rights include "the right to reasonable, accurate, and timely notice of any public court proceeding" involving the defendant's release. 18 U.S.C. §§ 3771(a)(2), (b)(1).

## CONCLUSION

For the foregoing reasons, this Court should deny Ruggiero's motion

for compassionate release based on COVID-19.


Respectfully submitted,

MARIA CHAPA LOPEZ
United States Attorney


By:    */s/ Lisa M. Thelwell*
Lisa M. Thelwell
Assistant United States Attorney
Florida Bar No. 100809
400 N. Tampa Street, Suite 3200
Tampa, Florida 33602-4798
Telephone:   (813) 274-6000
Facsimile:    (813) 274-6358
E-mail:        lisa.thelwell@usdoj.gov

**U.S. v. Charles Ruggiero**                    **Case No. 8:17-cr-302-T-02CPT**

## CERTIFICATE OF SERVICE

I hereby certify that on June 26, 2020, I electronically filed the

foregoing with the Clerk of the Court by using the CM/ECF system, which

will send a notice of electronic filing to the following:

Mark J. O'Brien, Esq.


*/s/ Lisa M. Thelwell*
Lisa M. Thelwell
Assistant United States Attorney
Florida Bar No. 100809
400 N. Tampa Street, Suite 3200
Tampa, Florida 33602-4798
Telephone:   (813) 274-6000
Facsimile:   (813) 274-6358
E-mail:      lisa.thelwell@usdoj.gov